**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

KEITH ALLEN WALTERS,        )
                                   )
            Plaintiff,      )
                                   )     Civil Action No. 12-256
          v.              )
                                   )     Judge Mark R. Hornak
MICHAEL J. ASTRUE,         )     Magistrate Judge Lisa Pupo Lenihan
Commissioner of Social Security,  )
                                   )
            Defendant.    )

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

## I. RECOMMENDATION

It is respectfully recommended that the Court grant Plaintiff's Motion for Summary Judgment (ECF No. 11), in part, and deny said judgment, in part, deny Defendant's Motion for Summary Judgment (ECF No. 13), vacate the decision of the administrative law judge ("ALJ"), and remand the case for further consideration.

## II. REPORT

**A.    BACKGROUND**

**1. Procedural**

Keith Allen Walters ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401 – 433, 1381 – 1383f ("Act").  Plaintiff filed for benefits claiming an inability to

work due to disability beginning October 14, 2008. (R. at 151 – 60).[1] At the time of his application for benefits, Plaintiff's alleged disabling impairments included herniated discs in the back and neck, abnormal curvature of the spine, and bipolar disorder. (R. at 183). Physical symptoms allegedly included frequent numbness and extreme pain in the arms and legs that prevented Plaintiff from sleeping through the night and forced him to use a walker to ambulate. (R. at 183). This condition was the result of a motorcycle accident in the late 1980's or early 1990's, and was allegedly exacerbated by falling on a cement block culvert in 2008. (R. at 183). Plaintiff's mental symptoms allegedly included mood swings, crying, frustration, and inability to interact with others. (R. at 183). Despite his claims, Plaintiff was denied benefits under the Act. (R. at 1 – 5, 19 – 38, 101 – 10). Having exhausted all administrative remedies, this matter now comes before the Court on cross motions for summary judgment. (ECF Nos. 11, 13).

**2. General**

Plaintiff was born on June 16, 1971, and was thirty nine years of age at the time of his administrative hearing. (R. at 48). Plaintiff was single, and had no dependent children. (R. at 48). He completed the twelfth grade, but had no post-secondary or vocational education. (R. at 50). Plaintiff last worked for eight to ten months in 2008 as a telemarketer – a job he received as part of a prison work-release program. (R. at 52, 54). He quit because he did not like dealing with the public on the telephone. (R. at 53). Plaintiff had most recently been incarcerated in Florida for twenty-seven months for various offenses, including robbery, grand theft, and battery on the elderly. (R. at 54). Prior to his time in prison, Plaintiff worked as a cement finisher between 1997 and 2005. (R. at 53, 224). He claimed that he lost that job as a result of his employer's closing. (R. at 53). However, the record also indicated that Plaintiff had been incarcerated in some form from 1998 until 2009. (R. at 60). Plaintiff had no significant periods

---

[1]        Citations to ECF Nos. 5 – 5-9, the Record, *hereinafter*, "R. at __."

of employment prior to his time allegedly spent as a cement finisher.  (R. at 54).  He had not sought employment since he quit his job as a telemarketer.  (R. at 55).

Plaintiff claimed that he was unable to return to work as a result of falling on a concrete culvert, when he attempted to jump over a small canal in Florida in October 2008.  (R. at 51 – 52).  The fall exacerbated a pre-existing injury.  (R. at 57).  Plaintiff most recently lived with his father, and subsisted on food stamps.  (R. at 49 – 50).  He also received medical benefits through the state.  (R. at 50).  Plaintiff relied upon his cousin to pay his bills, as well as go shopping and transport him to appointments.  (R. at 49, 62 – 62, 64, 72).  Plaintiff claimed that numbness and pain prevented him from being active, and he testified that he spent most days in bed watching television.  (R. at 57 – 58, 64 – 69, 74 – 75).  His mental state made him avoid interacting with others.  (R. at 58 – 59, 69 – 71).

### 3. Medical

X-rays of Plaintiff's sacrum, coccyx, lumbar spine, and cervical spine taken in August 2009 showed only mild disc changes and no evidence of fracture.  (R. at 258 – 60).  A September 2009 lumbar spine MRI demonstrated broad-based left foraminal disc protrusion at L5-S1 with more focal left paracentral extrusion completely effacing the left ventral recess and minimally displacing the traversing left S1 nerve root as well as producing moderate left foraminal stenosis, and central annular tear with small broad based central disc protrusion at L4-L5 minimally indenting the ventral thecal sac without significant central canal or foraminal stenosis.  (R. at 263).  A cervical spine MRI in October 2009 evinced degenerative changes primarily at the C5-C6 level, including a large broad-based central disc osteophyte complex indenting the cord and producing advanced central canal stenosis and minimal bilateral foraminal stenosis, without cord signal abnormality, and at the C6-C7 level, including moderate to large broad-based disc

osteophyte complex and mild bilateral uncovertebral hypertrophy effacing the ventral subarachnoid space with mild flattening of the ventral cord, and overall moderate to advanced central canal and minimal bilateral foraminal stenosis, without cord signal abnormality. (R. at 264).

Raymond F. Nino, M.D. completed a physical examination of Plaintiff on behalf of the Bureau of Disability Determination on November 19, 2009. (R. at 243 – 50). He noted that Plaintiff complained of severe pain in his neck and back stemming from a motorcycle accident. (R. at 243 – 50). Plaintiff also complained of concomitant numbness in his left leg and arm. (R. at 243 – 50). Plaintiff alleged that he could no longer walk for sustained periods. (R. at 243 – 50). Plaintiff used a cane to ambulate. (R. at 243 – 50).

Upon examination, Dr. Nino observed that Plaintiff was a well-developed, well-nourished man in no acute distress. (R. at 243 – 50). There was no swelling or atrophy referable to the spine, extremities, or any of Plaintiff's joints. (R. at 243 – 50). No sensory, motor, or cerebellar abnormalities were found. (R. at 243 – 50). Plaintiff's reflexes were unremarkable, and his motor power was normal. (R. at 243 – 50). Plaintiff had full range of motion in his upper extremities. (R. at 243 – 50). He exhibited difficulty performing movements and getting on and off the examination table. (R. at 243 – 50). Plaintiff had difficulty getting out of a chair, and could not stoop or arise from a crouching position. (R. at 243 – 50). Straight leg raising, both seated and supine, was positive. (R. at 243 – 50). Range of motion in the lower extremities was diminished. (R. at 243 – 50). Plaintiff did require the use of a cane, and his gait was unbalanced and ataxic even with its use. (R. at 243 – 50). Plaintiff could not walk on his heels and toes. (R. at 243 – 50).

In terms of specific functional limitations stemming from Plaintiff's pain, Dr. Nino opined that Plaintiff would be capable of frequently lifting and carrying up to twenty pounds. (R. at 243 – 50). Plaintiff could stand and walk no more than one hour of an eight hour work day, finding that he lacked the ability to ambulate more than fifty feet without stopping to rest due to lower back and leg pain. (R. at 243 – 50). Plaintiff could sit up to eight hours with the option to alternate between sitting and standing, as needed. (R. at 243 – 50). Plaintiff could not push or pull greater than forty pounds with his upper extremities. (R. at 243 – 50). Plaintiff could never stoop, crouch, or climb, and could only occasionally bend, kneel, and balance. (R. at 243 – 50). He would need to avoid workplaces with poor ventilation, heights, moving machinery, vibration, and temperature extremes. (R. at 243 – 50).

On November 24, 2009, Scott Tracy, Ph.D. completed a clinical psychological evaluation of Plaintiff on behalf of the Bureau of Disability Determination. (R. at 238 – 42). Dr. Tracy noted that he had been treating Plaintiff for major depressive disorder, and had seen him on six occasions prior to the completion of the evaluation. (R. at 238 – 42). He reported a history of childhood abuse at the hands of Plaintiff's parents, drug and alcohol abuse issues in early adulthood, and frequent encounters with the law – resulting in approximately ten of the last twenty years of Plaintiff's life being spent in prison. (R. at 238 – 42). Plaintiff complained primarily of difficulty with anger and mood swings, but also endorsed experiencing depression, isolation, worthlessness, helplessness, and sadness. (R. at 238 – 42). Plaintiff had difficulty interacting with other people, including his family, difficulty sleeping, and difficulty concentrating. (R. at 238 – 42).

At the examination, Dr. Tracy observed that Plaintiff's grooming and hygiene were poor. (R. at 238 – 42). His attitude was guarded and suspicious, his motor activity was hyperactive,

his speech loud and pressured, his affect expansive, and his mood anxious. (R. at 238 – 42). Plaintiff suffered minor memory issues, and had severely impaired judgment and insight. (R. at 238 – 42). There were, however, no abnormalities with perception, Plaintiff had adequate intellectual functioning, and he was alert and oriented. (R. at 238 – 42). Plaintiff had not yet begun a prescription medication regimen, and was to consult with a psychiatrist in the near future. (R. at 238 – 42). He was also engaging in cognitive and behavioral therapy, at that time. (R. at 238 – 42).

Dr. Tracy opined that Plaintiff's prognosis was poor, given a life-long history of mental health issues. (R. at 238 – 42). He diagnosed Plaintiff with major depressive disorder. (R. at 238 – 42). Plaintiff's global assessment of functioning[2] ("GAF") score was 44. (R. at 238 – 42). Plaintiff was considered to be unemployable at that point; however, Dr. Tracy could not speak to the appropriateness of long-term disability given the short duration of his treatment history with Plaintiff. (R. at 238 – 42).

Lanny Detore, Ed.D., performed a clinical psychological examination of Plaintiff for the Bureau of Disability Determination on February 2, 2010. (R. at 274 – 80). Plaintiff described to Dr. Detore experiencing explosiveness, mood swings, difficulty interacting with others, depression, nightmares stemming from his time in prison, and poor sleep, and informed Dr. Detore of a past diagnosis of bipolar disorder. (R. at 274 – 80). A history of drug and alcohol abuse was noted, as was Plaintiff's history of incarceration. (R. at 274 – 80). Plaintiff spent 1998 through 2009 in prison in Florida. (R. at 274 – 80). Plaintiff informed Dr. Detore that he

---

[2]     The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 41 – 50 may have "[s]erious symptoms (e.g., suicidal ideation …)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.*

was primarily raised by his paternal grandmother, because both of his parents were substance abusers. (R. at 274 – 80). Plaintiff moved to Florida when in his twenties, and when he was not incarcerated, he worked as a laborer and cement finisher. (R. at 274 – 80). Plaintiff reported limited activities of daily living. (R. at 274 – 80).

During his examination, Dr. Detore observed Plaintiff to be neat and clean in appearance. (R. at 274 – 80). Plaintiff was initially cooperative and marginally pleasant, but became very personable as the examination progressed. (R. at 274 – 80). Dr. Detore noticed a bandage on one of Plaintiff's hands, and Plaintiff explained that he had gotten angry and punched a wall recently. (R. at 274 – 80). Plaintiff was anxious throughout the interview and examination, had nervous speech, and trembling qualities. (R. at 274 – 80). He was initially slightly irritable, his affect was labile, and he exhibited tearfulness and sadness. (R. at 274 – 80). Plaintiff was found to be sensitive to others' perceptions of him, which manifested as mild paranoia. (R. at 274 – 80).

Plaintiff's intellect was average, his abstract thinking was intact, he was able to calculate serial 7s, could remember five events in forward order and five events in reverse order, and he was fully oriented. (R. at 274 – 80). However, he was unable to add, subtract, and multiply single digit problems, had difficulty remembering his Social Security number and telephone number, and demonstrated moderately impaired judgment and minimal insight. (R. at 274 – 80). He was noted to have been receiving psychiatric care and medication for approximately three months at the time of the examination, and Plaintiff felt that his mood swings and anger had been improving as a result. (R. at 274 – 80).

Dr. Detore diagnosed Plaintiff with mood disorder, explosive disorder, polysubstance abuse dependence, and antisocial personality disorder. (R. at 274 – 80). In light of his long

history of emotional dysfunction, Plaintiff's prognosis was poor. (R. at 274 – 80). He could however, manage his own funds and simple activities of daily living. (R. at 274 – 80). Dr. Detore further found that Plaintiff would experience marked limitation in interacting with the public, co-workers, and supervisors, and in responding appropriately to pressures and changes in a typical work setting. (R. at 274 – 80). He was otherwise only moderately to slightly limited. (R. at 274 – 80).

On February 22, 2010, state agency evaluator Jan Melcher, Ph.D., completed a Mental Residual Functional Capacity Assessment ("RFC") of Plaintiff. (R. at 281 – 84). Following a review of the medical record, Dr. Melcher concluded that the evidence supported impairments of affective disorder, personality disorder, and substance addiction disorder. (R. at 281 – 84). In terms of functionality, Plaintiff was believed to be no more than moderately to not significantly limited in all areas. (R. at 281 – 84). Dr. Melcher supported her conclusions by citing to a lack of hospitalizations or long-term treatment for mental disorders, and evidence of the ability to understand, retain, and follow simple job instructions, make simple decisions, ask simple questions, accept instruction, and function independently. (R. at 281 – 84).

Dr. Melcher dismissed the more severe findings of Dr. Detore as overestimates of Plaintiff's limitations, because the totality of evidence on file allegedly conflicted with his findings – though she cited to no such evidence as support – and because he seemingly relied primarily upon Plaintiff's subjective claims. (R. at 281 – 84). Dr. Melcher also rejected Dr. Tracy's conclusion that Plaintiff was unable to work, because such a conclusion is reserved to the Commissioner. (R. at 281 – 84). She ultimately stated that Plaintiff was capable of working full-time. (R. at 281 – 84).

On February 23, 2010, state agency evaluator Dilip S. Kar, M.D., completed a Physical RFC of Plaintiff. (R. at 298 – 305). In his assessment, Dr. Kar indicated that the medical evidence supported a finding of impairment in the way of lumbar degenerative disc disease. (R. at 298 – 305). Based upon his review of the medical record, Dr. Kar concluded that Plaintiff was capable of occasionally lifting and carrying up to twenty pounds, and frequently lifting and carrying ten pounds, that Plaintiff could stand or walk at least two hours of an eight hour work day and sit at least six hours, and that he could only occasionally climb, balance, stoop, kneel, crouch, or crawl. (R. at 298 – 305). Plaintiff was not otherwise limited. (R. at 298 – 305). Dr. Kar acknowledged that his findings conflicted with those of other sources on the record, but Dr. Nino's findings were believed to be inconsistent with other evidence in the record, and was therefore entitled to diminished weight. (R. at 298 – 305). Dr. Kar also found Plaintiff's subjective complaints of pain, alleged need for use of a cane or walker, and alleged limitation in activities of daily living to be less than credible. (R. at 298 – 305).

On April 5, 2010, Dr. Tracy completed a Mental Impairment questionnaire, and Medical Assessment of Ability to do Work-Related Activities (Mental). (R. at 306 – 08). He stated that Plaintiff had been diagnosed with bipolar disorder with mania and depression. (R. at 306 – 08). Plaintiff's GAF score was considered to be 48. (R. at 306 – 08). Plaintiff exhibited poor memory, sleep disturbance, personality change, mood disturbance, emotional lability, recurrent panic attacks, manic syndrome, and hostility/ irritability. (R. at 306 – 08). Dr. Tracy felt that Plaintiff was unable to work a normal work day/ week. (R. at 306 – 08). Specifically, Dr. Tracy noted that Plaintiff had poor to no ability to follow work rules, relate to co-workers, deal with the public, use judgment, interact with supervisors, deal with work stress, function independently, maintain attention and concentration, understand, remember, and carry out complex, detailed,

and simple job instructions, maintain personal appearance, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability. (R. at 306 – 08). Plaintiff could, however, manage his benefits. (R. at 306 – 08).

A Medical Statement Regarding Social Security Disability Claim was completed by Robin Baker, C.R.N.P. on May 10, 2010. (R. at 309). Ms. Baked indicated that Plaintiff suffered from low back pain, neck pain, and numbness and tingling in the left arm and leg. (R. at 309). She opined that the medical record supported a diagnosis of herniated discs in the lumbar spine, and stenosis in the cervical spine. (R. at 309). She did not state whether she felt that Plaintiff was able to work, but did note that Plaintiff was on pain medications and was treating with a pain management clinic. (R. at 309). Plaintiff had also been referred to an orthopedic physician, but had not gone for an examination. (R. at 309).

Pain management specialist Kuk S. Lee, M.D., began treating Plaintiff in August 2010. (R. at 348). At that time, it was noted that Plaintiff had been complaining of exacerbation of a pre-existing injury, and suffered symptoms of stiff and achy neck with left arm tingling and numbness, and low back pain with tingling, numbness, and stabbing pain in the left leg and foot. (R. at 348). Plaintiff stated that he had been on prescription pain medication for approximately six months and that he was not experiencing any relief. (R. at 348). In terms of prior diagnostic studies regarding Plaintiff's complaints, Dr. Lee found that a September 2009 EMG of Plaintiff's lower extremities was normal, cervical spine MRI showed disc and osteophyte complex at C5-C7, and lumbar spine MRI showed a broad based left foraminal disc protrusion at L5-S1 and a small broad based disc protrusion at L4-L5. (R. at 348).

Upon physical examination, Dr. Lee observed antalgic posture and gait, markedly limited active range of motion in the cervical spine, diffuse palpable tenderness in both shoulder girdles

and lower paracervical spinals, slightly decreased cervical lordotic curve, negative straight leg raising, mild left sided thoracolumbar scoliosis and slightly uneven pelvic level, normal lumbrosacral lordotic curve, diffuse palpable tenderness across the low back and both sacroiliac joints, markedly restricted active range of motion in the thoracolumbar spine, normal sensation in the feet and legs, normal reflexes, and normal sensation and movement of the upper extremities.  (R. at 349).

Dr. Lee concluded that Plaintiff likely experienced atypical lumbrosacral radicular symptoms with weak low back and lower abdominal musculatures and unstable motion segment in the lower lumbar spine and left sacroiliac joint.  (R. at 348).  Plaintiff also likely experienced chronic paracervical and shoulder girdle myofascitis with cervical spondylosis and multi-decreased active range of motion.  (R. at 349).  Plaintiff was to engage in long-term reconditioning, because narcotic pain medication alone was unlikely to provide relief.  (R. at 349).  Plaintiff would only obtain relief from pain by increasing range of cervical and lumbar spine motion via exercise and stretching.  (R. at 349).

On September 28, 2010, an EMG/ electrodiagnostic study was conducted to determine to what extent – if any – Plaintiff suffered from radiculopathy.  (R. at 310).  Plaintiff's complaints of recently exacerbated lower back and neck pain, as well as left arm and leg numbness and pain, were noted.  (R. at 310).  Following the EMG, the attending physician concluded that the electrodiagnostic study was normal, and that there was no evidence of left cervical or lumbrosacral radiculopathy, neuropathy, or myopathy.  (R. at 310).

Plaintiff visited Dr. Lee for treatment in October and December 2010, and in February 2011.  (R. at 315 – 16, 346 – 47).  Plaintiff was noted to be experiencing slow – but fair – progress, and could tolerate his pain with his medications and therapeutic exercises.  (R. at 315 –

16, 346 – 47).  Plaintiff rated his pain as five or six on a scale of ten.  (R. at 315 – 16, 346 – 47).

Plaintiff's grip strength was normal, he could walk on his heels and toes, straight leg raising was negative, and he had normal sensation and movement of the extremities.  (R. at 315 – 16, 346 – 47).  Limitation in motion and tenderness were still observed in the spine.  (R. at 315 – 16, 346 – 47).  Plaintiff was advised to continue his exercise and medication regimen.  (R. at 315 – 16, 346 – 47).

Dr. Lee completed a Spinal Impairment Questionnaire on February 28, 2011.  (R. at 327 – 33).  He diagnosed Plaintiff with chronic left sciatica with left sided disc herniation and chronic paracervical and shoulder girdle myofascitis.  (R. at 327 – 33).  His prognosis was fair. (R. at 327 – 33).  Plaintiff was noted to have limited range of motion in the cervical and lumbar spine, tenderness around the cervical and lumbar spine, as well as the sacroiliac joints, abnormal gait, tingling and numbness in the left leg and arm, and some pain in the left leg.  (R. at 327 – 33).  Dr. Lee stated that a cervical spine MRI showed degenerative changes at the C5-C7 levels of Plaintiff's spine, a lumbar spine MRI showed broad based left foraminal disc protrusion at L5-S1, and central annular tear with small broad based central disc protrusion at L4-L5.  (R. at 327 – 33).  Prescription medication had not completely relieved Plaintiff's pain.  (R. at 327 – 33). Plaintiff's only other treatment was a home exercise program.  (R. at 327 – 33).

Dr. Lee specifically found that Plaintiff could sit not more than three hours of an eight hour work day, could stand and walk only three hours, would need to change position every few hours, could not bend or stoop, could occasionally lift and carry ten to twenty pounds and frequently lift and carry five to ten, could expect periodic interference with attention and concentration due to pain, would not be able to keep his neck in a constant position, and was likely to miss two to three days of work per month.  (R. at 327 – 33).  While Dr. Lee did not feel

that psychological factors impacted Plaintiff's physical symptoms and functional limitations, he did feel that Plaintiff's mental state made him incapable of tolerating even low stress work environments. (R. at 327 – 33).

**B.**    **ANALYSIS**

**1. Standard of Review**

To be eligible for social security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F. 2d 581, 583 (3d Cir. 1986). When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24 – 25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age,

education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F. 2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)[3], 1383(c)(3)[4]; *Schaudeck v. Comm'r of Soc. Sec.*, 181 F. 3d 429, 431 (3d Cir. 1999). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. §706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Burns v. Barnhart,* 312 F. 3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F. 3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the

---

[3]     Section 405(g) provides in pertinent part:

>    Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[4]     Section 1383(c)(3) provides in pertinent part:
>    The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 – 97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196 – 97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F. 2d 1185, 1190 – 91 (3d. Cir. 1986).

## 2. Discussion

In his decision, the ALJ found that Plaintiff experienced medically determinable severe impairment in the way of lumbar degenerative disc disease, mood disorder, antisocial personality, and polysubstance abuse. (R. at 24). In spite of these impairments, Plaintiff was capable of light work. (R. at 27). However, such work could require no more than occasional lifting and carrying of twenty pounds or frequent lifting and carrying of ten pounds, standing and walking two hours of an eight hour work day, or sitting six hours with a sit/stand option, alternating – as needed – every fifteen minutes, occasional climbing of ramps and stairs, occasional balancing, stooping, kneeling, crouching, and crawling, and limited bilateral overhead reaching. (R. at 27). Plaintiff could not climb ladders, ropes, or scaffolds, would need to be able to use a hand-held assistive device at all times when standing and be limited to use of the contralateral upper extremity for lifting and carrying, must avoid all exposure to unprotected heights and hazardous machinery, must be limited to simple, routine, repetitive tasks in a work environment free of fast paced production requirements involving only simple work-related decisions with few, if any work place changes, no interaction with the public, and only

occasional interaction with co-workers. (R. at 27). Based upon the testimony of a vocational expert, the ALJ determined that even with such limitations, light exertional work for which Plaintiff would qualify existed in significant numbers in the national economy. (R. at 33 – 35). Plaintiff was not, therefore, entitled to DIB or SSI.

Plaintiff objects to the determination of the ALJ, arguing that numerous errors were made during the 5 Step analysis. Plaintiff argues that the first point of error was the ALJ's failure to find that Plaintiff suffered from a "severe" cervical spine impairment at Step 2. (ECF No. 12 at 21 – 23; ECF No. 15). Plaintiff next argues that the ALJ disregarded the more serious findings of Drs. Nino, Lee, Tracy, and Detore without providing an objective evidentiary basis for doing so. (ECF No. 12 at 23 – 29; ECF No. 15). Similarly, Plaintiff urges the Court to review the ALJ's treatment of his subjective complaints, because the ALJ allegedly discredited these subjective complaints without providing an objective evidentiary basis for doing so. (ECF No. 12 at 29 – 30; ECF No. 15).

As it relates to the ALJ's Step 2 findings, Plaintiff provided the court with evidence from the record which demonstrated the existence of degeneration in the cervical spine, some of decreased grip strength, decreased strength over the left upper extremity, limitation of cervical spine range of motion, and an inability to maintain a constant neck position. The ALJ makes no attempt to provide an evidentiary basis for his conclusion at Step 2. (R.at 25). However, he indirectly justified his treatment of Plaintiff's cervical spine condition in his subsequent recitation of Plaintiff's treatment history. This history included diagnostic imaging studies such as an October 2009 cervical MRI which demonstrated no cord signal abnormality, and a September 2010 EMG which provided no evidence of left cervical radiculopathy, neuropathy, or myopathy. (R. at 29 – 30).

He also indirectly addressed the import of limitations attributable to Plaintiff's cervical spine by discussing the medical sources whose findings lent some support to Plaintiff's argument – namely, Drs. Nino and Lee. The ALJ gave little weight to Dr. Nino and Dr. Lee because their findings contained inconsistencies. For example, Dr. Nino found that Plaintiff had normal reflexes, normal motor power, no atrophy, normal range of motion in the upper extremities, and normal range of motion in the cervical spine, but also positive straight leg raising and an inability to walk on his heels and toes. (R. at 29). Dr. Lee found that Plaintiff had normal grip strength, the ability to walk on his heels and toes, negative straight leg raising, and normal sensation and motor ability. (R. at 30). They had differing opinions as to Plaintiff's ability to sit and stand during the work day. (R. at 31 – 33). These findings did not provide significant support for a "severe" impairment of the cervical spine, and were inconsistent. Plaintiff was able to complete exercises recommended by Dr. Lee, and made fair progress in therapy. (R. at 31, 33). In addition to these inconsistent findings, the diagnostic imaging studies earlier mentioned, and Plaintiff's therapeutic regimen, Dr. Kar concluded – based upon a review of the medical record – that Plaintiff was not as limited as Drs. Nino and Lee believed. (R. at 32).

While the record evidence clearly showed that Plaintiff experienced limitations due to his physical state, the ALJ provided ample support for affording the conclusions of Drs. Nino and Lee less than full weight. "[T]he opinion of a . . . physician does not bind the ALJ on the issue of functional capacity," and "[s]tate agent opinions merit significant consideration." *Chandler v. Comm'r of Soc. Sec.*, 667 F. 3d 356, 361 (quoting *Brown v. Astrue*, 649 F. 3d 193, 197 n. 2 (3d Cir. 2011)). A showing of contradictory evidence and an accompanying explanation will allow an ALJ to reject a physician's opinion outright, or accord it less weight. *Brownawell v. Comm'r of Soc. Sec.*, 554 F. 3d 352, 355 (3d Cir. 2008). Moreover, a medical opinion is not entitled to

any weight if unsupported by objective evidence in the medical record. *Plummer v. Apfel*, 186 F. 3d 422, 430 (3d Cir. 1999) (citing *Jones v. Sullivan*, 954 F. 2d 125, 129 (3d Cir. 1991)). To the extent Drs. Nino and Lee's opinions were relied upon by Plaintiff to argue in favor of a "severe" cervical spine impairment, it is clear from the ALJ's overall discussion that such opinions were satisfactorily considered and rejected – implicitly, in the case of Dr. Lee's belief that Plaintiff could not perform a job that required him to constantly maintain a particular neck position.

Further, if indeed it was error to fail to find a "severe" cervical spine impairment at Step 2, such error was harmless, given that – based upon the above discussion – there were no additional limitations ultimately attributable to Plaintiff's cervical spine. *See Brown,* 649 F. 3d at 195 (despite the technical correctness of a claimant's argument, an error is harmless when there is no set of facts upon which a recovery may be had). As such, the ALJ's Step 2 determination was supported by substantial evidence, as was his rejection of the more severe findings of Drs. Nino and Lee.

With respect to the ALJ's rejection of Drs. Tracy and Detore's severe findings, the ALJ was not so thorough. Plaintiff argues that it was error to fail to include what the record clearly established was moderate – at the least – limitation in the ability to interact with supervisors. Further, Plaintiff claims that the ALJ considered Drs. Tracy and Detore's functional assessments to have little value due to reliance upon subjective complaints and due to inconsistency with the record, as a whole, but provided no objective evidence to refute their findings. The Court is inclined to agree with Plaintiff.

The medical record clearly established that both Drs. Tracy and Detore found that Plaintiff would have marked limitation interacting with supervisors. Dr. Melcher found that Plaintiff would have moderate limitation, in that regard. Yet, the ALJ failed to include such a

limitation in his hypothetical and RFC, despite having included similar limitations respecting Plaintiff's exposure to the public and co-workers. The ALJ provided no explanation for this omission. An ALJ "must accurately convey to the vocational expert all of a claimant's credibly established limitations." *Rutherford v. Barnhart*, 399 F. 3d 546, 554 (3d Cir. 2005). "Limitations that are medically supported and otherwise uncontroverted in the record, but that are not included in the hypothetical question posed to the expert, preclude reliance on the expert's response." *Id.* As there was no evidence provided to counter the existence of at least moderate limitation with supervisor interaction, the ALJ's failure was error requiring remand.

The ALJ's next point of error was his treatment of Drs. Tracy and Detore's functional assessments. The ALJ made a general recitation of the medical source reports, and dismissed them out of hand as inconsistent with the medical record as a whole. (R. at 31 – 32). However, the ALJ failed to indicate with which medical records either assessment was inconsistent, and failed to discuss any details. As far as the record in this case is concerned, it is the assessment notes of Drs. Tracy and Detore that constitute the entirety of Plaintiff's psychological record. The ALJ must do more than make a broad generalization of inconsistency. *See Morales v. Apfel*, 225 F. 3d 310, 318 (3d Cir. 2000) ("ALJ cannot, as he did here, disregard this medical opinion based solely on his own 'amorphous impression, gleaned from the record and from his evaluation of the claimant's credibility'") (citation omitted). Substantial evidence cannot be said to support the ALJ's rejection of Dr. Tracy of Dr. Detore on this basis. Even Dr. Melcher's rejection of their more serious findings did not explicitly provide an evidentiary basis for such rejection. The ALJ cannot reject probative evidence for "no reason or for the wrong reason." *Morales v. Apfel*, 255 F.3d 310, 317 (3d Cir. 2000) (citing *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir. 1993)). The ALJ's decision should allow a reviewing court the ability to

determine if "significant probative evidence was not credited or simply ignored." *Fargnoli v. Massanari*, 247 F. 3d 34, 42 (3d Cir. 2001). "Courts cannot exercise their duty of review unless they are advised of the considerations underlying the action under review." *Cotter*, 642 F. 2d at 705 n. 7 (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943)). Such is the case, here.

Dr. Detore's assessment was also rejected due to its seeming over-reliance upon Plaintiff's subjective reports. (R. at 32). This is not necessarily fatal to an assessment's credibility. However, "the mere memorialization of a claimant's subjective statements in a medical report does not elevate those statements to a medical opinion. *Morris v. Barnhart*, 78 Fed. App'x 820, 824 (3d Cir. 2003) (citing *Craig v. Chater*, 76 F. 3d 585, 590 n. 2 (4th Cir. 1996)). "An ALJ may discredit a physician's opinion on disability that was premised largely on a claimant's own accounts of her symptoms and limitations when the claimant's complaints are properly discounted." *Id.* at 825 (citing *Fair v. Bowen*, 885 F. 2d 597, 605 (9th Cir. 1989)).

An ALJ should accord subjective complaints similar treatment as objective medical reports, and weigh the evidence before him. *Burnett v. Comm'r of Soc. Sec.*, 220 F. 3d 112, 122 (3d Cir. 2000). The ALJ must assess the intensity and persistence of a claimant's pain and limitation, and determine the extent to which it impairs a claimant's ability to work. *Hartranft v. Apfel*, 181 F. 3d 358, 362 (3d Cir. 1999). This includes determining the accuracy of a claimant's subjective complaints. *Id.* Serious consideration must be given to subjective complaints where a medical condition could reasonably produce the claimed limitations. *Mason v. Shalala*, 994 F. 2d 1058, 1067 – 68 (3d Cir. 1993). When medical evidence provides objective support for subjective complaints, the ALJ can only reject such a complaint by providing contrary objective medical evidence. *Id.* Additionally, there need not be objective evidence of a subjective complaint, and the ALJ must explain his rejection of same. *Id.* (quoting *Green v. Schweiker*, 749

F. 2d 1066, 1071 (3d Cir. 1984)); *Burnett*, 220 F. 3d at 122.    However, while pain itself may be disabling, and subjective complaints of pain may support a disability determination, allegations of pain suffered must be consistent with the objective medical evidence on record.  *Ferguson v. Schweiker*, 765 F. 2d 31, 37 (3d Cir. 1985); *Burnett*, 220 F. 3d at 122.

The ALJ discusses Plaintiff's credibility at length in his decision.  The ALJ noted Plaintiff's claims that he did nothing but watch television all day due to debilitating pain, performed only the most minimal activities of daily living for the same reason, isolated himself due to his inability to interact with others in an appropriate manner, suffered frequent mood swings, experienced frequent panic attacks, was often tearful, and had difficulty sleeping due to nightmares about his time in prison.  (R. at 25 – 28).  The ALJ discounted these reports for several reasons: there was no evidence suggesting that Plaintiff – for either physical or emotional reasons – could not engage in more substantial activities of daily living; Plaintiff frequently interacted with his cousin and uncle; Plaintiff was capable of going out alone; Plaintiff quit his last job because he did not want to deal with people on the phone, but was not fired and did not seek other employment that would not have required dealing with the public; Plaintiff had no significant history of psychiatric care or hospitalization; there were no objective findings indicating that Plaintiff experienced panic attacks, as alleged; Plaintiff engaged in only conservative treatment of his physical ailments via medication and home exercise; and, although stating that he did not pursue surgery due to his fear of paralysis, Plaintiff never sought treatment with an orthopedic specialist, as recommended.  (R. at 25 – 28, 30 – 32).

These discrepancies in the factual record provide ample reason for the ALJ to find Plaintiff less than credible in his decision rationale.  Further, to the extent any medical source relied on subjective claims by Plaintiff, the ALJ was justified in according such opinions lesser

weight. As such, the Court finds that substantial weight supported the ALJ's treatment of Plaintiff's subjective claims. Further, to the extent Dr. Detore relied solely upon Plaintiff's subjective statements to reach his conclusions, the ALJ properly denied such conclusions significant weight.

## C.    CONCLUSION

Based upon the foregoing, the ALJ failed to bolster his rejection of Drs. Tracy and Detore's medical opinions, to the extent that they were allegedly inconsistent with the remainder of the medical record, with sufficiently specific evidence. However, as discussed, the remainder of the ALJ's conclusions were supported by substantial evidence. Accordingly, it is respectfully recommended that Plaintiff's Motion for Summary Judgment be granted to remand for reconsideration of Dr. Tracy and Dr. Detore's medical findings, and denied to the extent that further relief is requested.

"On remand, the ALJ shall fully develop the record and explain [his or her] findings… to ensure that the parties have an opportunity to be heard on the remanded issues and prevent *post hoc* rationalization" by the ALJ. *Thomas v. Comm'r of Soc. Sec.*, 625 F. 3d 798, 800 – 01 (3d Cir. 2010). *See also Ambrosini v. Astrue*, 727 F. Supp. 414, 432 (W.D. Pa. 2010). Testimony need not be taken, but the parties should be permitted input via submissions to the ALJ. *Id.* at 801 n. 2.

For the reasons set forth above, it is respectfully recommended that Plaintiff's Motion for Summary Judgment (ECF No. 11), be granted in part, and denied, in part; that Defendant's Motion for Summary Judgment (ECF No. 13) be denied, that the decision of the administrative

law judge be vacated and that the case be remanded for further proceedings consistent with this Report and Recommendation.

In accordance with the Magistrate Judges Act, 28 U.S.C. 636(b)(1)(B) and (C), and Rule 72.D.2 of the Local Rules of Court, the parties are allowed fourteen (14) days from the date of service of a copy of this Report and Recommendation to file objections. Any party opposing the objections shall have fourteen (14) days from the date of service of objections to respond thereto. Failure to file timely objections will constitute a waiver of any appellate rights.

_____
Lisa Pupo Lenihan
United States Magistrate Judge


Dated: February 4, 2013
cm/ecf: All counsel of record.